UNITED STATES v. THE ALAMEDA et al.

(Third Division. Valdez. May 9, 1917.)

No. 779.

SHIPPING ☞81(1)—CABLES—INJURIES BY VESSEL.

The steamship Alameda, in docking at Valdez, was obliged to drop her anchor for protection in a heavy wind. About that time the United States cable was broken at about that point on the shore. There was no notice or sign posted, and no chart or warning given to mariners of the location of the cable, and the master of the vessel testified he did not know where it was. *Held*, in the absence of direct proof of the breaking of the cable by the anchor, and that no notice, sign, or chart gave notice where it was, the United States could not recover.

About 5 o'clock on the morning of December 17, 1913, the steamer Alameda made an attempt to land at the Valdez dock. The wind was blowing a gale and shifting, so that (the practically undisputed testimony shows) it became necessary to drop the starboard anchor to avoid coming into collision with the wharf, to the possible injury of those thereon. This maneuver was not successful in effecting a landing. The anchor was raised partially, so that it remained suspended on about 25 fathoms of chain and in this position, the vessel made a circle of about half a mile or so and again approached the wharf, and this time succeeded in landing, by the aid of the anchor, which caught in the steep·shelving bank which pitches off abruptly from about the outer edge of the dock. The waters of Valdez Bay are very deep, so that seamen generally regard it as not anchorage ground.

The vessel remained at the dock from about 5 a. m. until about 10:30 a. m. Its anchor remained on the bottom during that time.

About 10:30 the lines were let go at the dock, the wind having then abated, and the vessel dropped back until nearly over the anchor. The anchor was then raised, and the steamer proceeded on its way. About the same time, to wit, about 10:30 a. m., two lines of deep-sea cable operated by the United States Signal Corps, which ran from underneath the said wharf, one running to Sitka, and the other running across

Valdez Bay to Ft. Liscum, were interrupted, and remained so for a week or two later, when the United States cable repair ship Burnside arrived from Seattle to repair the breaks.

The testimony of the officers of said repair ship shows that they grappled and pulled up said cables, which were so deeply buried in the mud that each was broken by the strain of lifting from the repair ship, one at a distance of about 1,000 feet from the Valdez shore and the other a distance of about a mile. The ends that were broken on the 17th day of December, 1913, were never found.

As to what actually occurred in the matter of the docking and anchoring of said steamer on the 17th day of December, 1913, the libelant has to depend almost entirely upon the officers and crew of the said steamer. The captain testified that owing to the violence of the wind it was absolutely necessary for him to let go his anchor as he did, in order to save, not only the vessel, but the wharf and those who were upon it; that it was necessary to allow the anchor to remain suspended, as it was, in making the second attempt to land, in order to prevent a like occurrence. In this he is corroborated by the testimony of every officer of the vessel and some six or seven other master mariners, thoroughly familiar with conditions at Valdez, who testified, in answer to hypothetical questions setting forth the conditions existing at the time, that he acted in a prudent and seamanlike manner.

Practically the undisputed testimony shows that when the anchor was raised, about 10:30, it did not show any evidence of being entangled with any cable, and there is no direct evidence whatever to prove that such was the case, and the whole case of the libelant is based upon circumstances which it contends establish that fact, for the reason that the breaking can be accounted for upon no other reasonable theory.

There has been considerable hearsay testimony offered by the libelant and objected to by the respondent, which was clearly not competent to establish the act charged. It may be and probably is true that a strong suspicion is raised that the anchor of this vessel did in fact break the cable; but cases cannot be decided upon suspicion, however strong, in the absence of legal and convincing proof. There is testimony in the case tending to prove that these cables had been broken before by earthquake shocks, although no earthquake is shown to

have occurred at or near Valdez at this time; also that great deposits of alluvial are formed near the outer face of this wharf, which sometimes break off into the deep water below, and there is a possibility that this might have caused the break. But, even though it be extremely probable that the anchor of the Alameda might in fact have been the cause of the breaking of the cable, there is, in my opinion, no satisfying or convincing evidence thereof.

Mr. Henry Winter, the cable engineer on the repair ship Burnside, who was the chief expert called on the part of the libelant in the matter of the picking up of the cable, testified that he was not able to state the actual cause of the breaking, and can only give his opinion, and that "he could not say that the anchor of the Alameda actually broke the cable."

W. N. Spence, of Valdez, and W. A. Mundy, of Portland, Or., for the United States.

R. E. Capers, of Cordova, for defendants.

BROWN, District Judge. Even if the anchor of the Alameda did in fact break the cable, I am still of the opinion that the libelant is not entitled to recover here, for the reason that the location of said cables was not known to Capt. Warner of the Alameda, was not charted, no circular notice thereof had ever been sent out by any department of the government of the United States, and no sign had been placed on the wharf or elsewhere indicating its location.

The theory upon which the libelant seeks to recover is that it was the duty of the captain to be informed of the exact location of this cable, knowing it to be a fact that there was a cable in Valdez Bay, running from the town of Valdez. The outer dock or landing place is reached by an approach of some 1,800 feet, over mud flats, from the town of Valdez, and from about the outer row of piling the bank pitches down at a very sharp angle to a depth of 200 or 300 feet, and the depth of the waters in said bay varies from 300 to 800 feet. Said bay is about 12 miles long and about 3½ miles wide.

The testimony of Capt. Warner shows that he, as a master of steamships, has been running into Valdez Bay for the last ten years, and never knew where said cables were laid. The libelant contends that it is the duty of the captain to have ascertained the location of the cables; but it is not clear at all

from the testimony that he could have done so, had he made the effort (which he does not claim to have made), for the reason that Maj. B. O. Lenoir, a witness for the libelant, who was the officer in charge of the Alaskan cable at Seattle, testified that, if inquiry was made at the local cable office at Valdez, it would be referred from one man to another higher up until it finally reached the War Department, and he had never been able to get them to chart or give notice of the location of United States cables.

The libelant claims that Capt. Warner was negligent in not being informed as to the location of said cable, although seven other master mariners and pilots, constituting probably a majority of the sea captains who bring steamers regularly into Valdez Bay, testified in this case that they did not know the location of said cables, and never had heard, until about a year after the accident complained of here, when a chart and notice were issued by Maj. B. O. Lenoir giving the location of said cables, which it may here be noted were relaid by the repair ship Burnside at a point considerably north of the said dock, so that a vessel anchoring in an emergency to avoid collision with the dock would not foul the cable.

The testimony of Mr. Winter shows that he was in charge of the work of laying this cable originally, ten or more years ago, and that he knew "it frequently becomes necessary for vessels to let go anchors in making dock in stress of weather, to avoid damage to the ships and docks."

The libelant here cannot claim any higher or greater rights than a private individual would in like circumstances, and it would not come with very good grace for the owner of a cable to impute negligence to a vessel fouling it with its anchor, where he had kept the location a profound secret for ten years or more. To hold that Capt. Warner was negligent in not knowing the location of this cable is to find that Capt. J. C. Hunter, Capt. J. Johansen, Capt. C. B. McMillan, Capt. C. D. Westerlund, Capt. C. J. O'Brien, and Capt. Michael M. Jensen were equally guilty of negligence and deficient in important knowledge of the waters which they have courageously navigated for many years, probably the most difficult and dangerous waters of any coast in the world, and have at all times been alert and zealous in the protection of the lives and property intrusted to their care.

A number of cases allowing damages for the breaking of cable have been cited by libelant, but in nearly all the cases the breaking of the cable by the anchor of the vessel was admitted, or else the location thereof was generally known, and charted, or marked, or else in the fouling of the cable the captain or officers of the vessel were negligent in not disentangling their anchor, or even slipping their anchor, to avoid the greater loss of breaking the cable.

Under the treaty of 1884 between the United States and various other countries relating to submarine cables, it is provided that the owner of the cable will compensate the owner of any vessel which loses its anchor or other equipment in avoiding injury to the cable.

Counsel for libelant lays particular stress on the case of Davidson S. S. Co. v. United States, 205 U. S. 193, 27 Sup. Ct. 482, 51 L. Ed. 764, citing from the opinion in this case:

"The harbor was one of great importance, although he (the captain) had not been in it for over a year. He knew that harbor improvements on the Great Lakes were being made by the government, that information of the condition of those improvements was given from time to time by circulars from the Departments, and still made no efforts to ascertain the then condition of the harbor; the only chart he had being an old one. In addition to the fact that he knew where information could be obtained, might have assumed that he would be likely to be sent to any one of the many important harbors, and ought to have prepared himself therefor, there was testimony that official circulars and notices were mailed to him at his post office address, although he states that he failed to receive them, and relied upon the knowledge which he had from his visit of more than a year theretofore and upon what he should find as he entered the harbor. Now, there is an obligation on all persons to take the care which under the special circumstances of the case a reasonable and prudent man would take, and the omission of that care constitutes negligence. It was said by Mr. Justice McLean, delivering the opinion in Culbertson v. Shaw et al., 18 How. 584, 587 [15 L. Ed. 493]: 'When a steamer is about to enter a harbor great caution is required. There being no usage as to an open way, the vigilance is thrown upon the entering vessel. Ordinary care, under such circumstances, will not excuse a steamer for a wrong done.'"

It here appears that the obstruction to navigation was generally known to mariners, that the knowledge thereof could easily have been obtained by the captain, and further that official circulars were mailed to him giving notice thereof, which is quite a different state of affairs from that in the case at bar, where it is not even shown that any information could have

been obtained by the captain of the Alameda, had he sought it, that the location of such cable was not generally known, and that all the other sea captains mentioned had no notice thereof, and did not consider that they were lacking in care and prudence in not knowing such location.

There does not seem to be any force in the suggestion of the libelant that the location of this cable was kept secret as a matter of military strategy, for the reason that about a year after the breaking of this cable, to wit, in the year 1914, blueprints were issued showing its location, and showing that it had been moved quite a distance from the dock, so that there would be less likelihood of future injury thereto by the anchors of ships, and this at a time when secrecy for military reasons would seem to be more necessary than theretofore.

Libelant also calls particular attention to the case of Culbertson v. The Southern Belle, 18 How. (59 U. S.) 586, 15 L. Ed. 493. This is also a case where the obstruction injured was at a point where it had a right to be by general usage, which usage was generally known and understood.

I am of the opinion, therefore, that the libelant has failed to establish its case, that the libel ought to be dismissed, and judgment will be entered accordingly. Judgment may be prepared in accordance with this opinion.